UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Case No. 1:15-cr-48 (CRC) |
| | ) | |
| DAVID BRONSTEIN, *et al.*, | ) | **HEARING REQUESTED** |
| | ) | |
| DEFENDANTS | ) | |
| | ) | |
| _____ | ) | |

## MOTION TO DISMISS

Defendants respectfully move the Court to dismiss Count Two of the Superseding

Information (violation of 40 USC § 6134). For the reasons set forth in the attached

Memorandum, the relevant portions of the statute under which Defendants are charged

are facially unconstitutional.

Defendants request a hearing on this motion.

/s/ Jeffrey Light
_____

Jeffrey L. Light
LAW OFFICE OF JEFFREY LIGHT
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey@LawOfficeOfJeffreyLight.com
*Attorney for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| vs. | ) Case No. 1:15-cr-48 (CRC) |
| | ) |
| DAVID BRONSTEIN, *et al.*, | ) |
| | ) |
| DEFENDANTS | ) |
| | ) |
| | ) |
| | ) |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS</u>

### Introduction

Through a collection of criminal statutes, Congress has attempted to turn the Supreme Court and its grounds into a First Amendment-free zone. *See* 40 U.S.C. § 6132 (prohibiting solicitations, signs, placards, and advertisements); 40 U.S.C. § 6134 (prohibiting making a harangue or oration, and uttering loud, threatening, or abusive language); 40 U.S.C. § 6135 (prohibiting parading, standing, or moving in processions, and displaying a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement). Congress also delegated to the Supreme Court the authority to promulgate additional regulations, a power which has been used to further restrict First Amendment rights. *See* 40 U.S.C. § 6102 (authorizing the Marshal, with approval from the Chief Justice, to issue additional regulations); Regulation Six

(prohibiting the use of certain types of signs on the perimeter sidewalk); Regulation

Seven (prohibiting demonstrations).[1]

The particular speech-suppressing with which Defendants have been charged in

this case is 40 U.S.C. § 6134, which make it "unlawful to discharge a firearm, firework or

explosive, set fire to a combustible, make a harangue or oration, or utter loud,

threatening, or abusive language in the Supreme Court Building or grounds." 40 U.S.C. §

6134. Specifically, Count Two of the Superseding Information charges, "On or about

April 1, 2015, in the District of Columbia, defendants DAVID BRONSTEIN,

MATTHEW KRESLING, YASMINA MRABET, BELINDA RODRIGUEZ, and

RICHARD SAFFLE, did unlawfully make a harangue or oration, or utter loud,

threatening, or abusive language in the Supreme Court Building or grounds." [ECF dkt:

25.] Because the Harangue Clause and the Uttering Clause[2] are unconstitutional on their

face, Defendants move the Court to dismiss Count Two.


## Argument

### I.       The Harangue Clause is Unconstitutional

The Harangue Clause absolutely bans a medium of expression – speechmaking – at

any time and in any part of the forum. Such "an absolute prohibition on a particular type

of expression will be upheld only if narrowly drawn to accomplish a compelling

governmental interest." *United States v. Grace*, 461 U.S. 171, 177 (1983) ("*Grace II*").

---

[1] Supreme Court Building Regulations are available at
http://www.supremecourt.gov/publicinfo/buildingregulations.aspx
[2] For convenience, the two clauses of 40 U.S.C. § 6134 with which Defendants have been
charged will be referred to as the Harangue Clause ("make a harangue or oration") and
the Uttering Clause ("utter loud, threatening, or abusive language").

No conceivable governmental interest is accomplished by the Harangue Clause's broad prohibition on First Amendment conduct and therefore it is unconstitutional.

In *Grace v. Burger*, 665 F.2d 1193 (D.C. Cir. 1981) ("*Grace I*"), the D.C. Circuit considered the constitutionality of a statute which prohibited assemblages on the Supreme Court building and grounds, as well as the display of flags and banners. The statute, 40 U.S.C. § 13k (now codified at 40 U.S.C. § 6135), was found to be "repugnant to the First Amendment of the Constitution" and declared unconstitutional. 665 F.2d at 1194. In *Grace II*, the Supreme Court vacated the decision – not because of any disagreement with the D.C. Circuit's constitutional analysis – but because the remedy granted by the appellate court was too broad. The Supreme Court construed the plaintiff's challenge not as a facial challenge, but as a challenge to the applicability of the "display" clause to the perimeter sidewalk, and found the statute unconstitutional as-applied. 461 U.S. at 175.

The Harangue Clause is similar in nature and scope to the Assemblages Clause which was struck down as unconstitutional in *Grace I*, and then again by this Court in *Hodge v. Talkin*, 949 F. Supp. 2d 152 (D.D.C. 2013).[3] Both apply to the entire Supreme Court building and grounds and both ban an entire medium of expression. The government has not yet had an opportunity to assert the interest which is furthered by the Harangue Clause, but it is likely to be the same as the interest it has asserted with respect to the Assemblages Clause – to maintain unimpeded egress and ingress, and to preserve the appearance of the Court as a body not swayed by public opinion. This Court should

---

[3] The defendants in *Hodge* appealed the judgment to the D.C. Circuit. Oral arguments have been occurred in the case, but no decision has been issued yet.

follow the lead of the D.C. Circuit in *Grace I* and Judge Howell in *Hodge*, and reject these asserted interests as insufficient to justify a complete ban on speech.

Although *Grace I* and *Hodge* were well-reasoned and persuasive, the Court must consider the significance of the fact that this case is in a different procedural posture. *Grace I*, *Grace II*, and *Hodge* all involved pre-enforcement civil challenges, whereas this case involves a challenge by criminal defendants. In *Grace II*, there was no charging document and therefore the Supreme Court could only review the statute to the extent that it was applicable to plaintiff's proposed conduct. *See Hodge*, 949 F. Supp. 2d at 177 ("Absent a formal charging instrument specifying the precise clause of the statute that the plaintiffs were accused of violating, the Supreme Court cabined its review to the precise facts underlying the constitutional challenge, which the Court found limited to enforcement of the Display Clause on the sidewalks surrounding the Supreme Court.") In this case, there is a formal charging instrument and it charges Defendants with violating the Harangue Clause "in the Supreme Court Building or grounds." [ECF dkt: 25.] Accordingly, the Court cannot cabin its review of the Harangue Clause to the sidewalk (as in *Grace II*), to the plaza (as in *Hodge*), or to the interior of the Supreme Court. Thus, although the D.C. Circuit in *Grace I* was incorrect to have analyzed the statute as it applied to the entire forum, that analysis is exactly what is called for here.

The Supreme Court building and grounds encompass both a public forum (the perimeter sidewalk), a nonpublic forum (the interior of the building), and a forum whose status is unsettled (plaza). After acknowledging that potentially different analysis applied to different types of forums, the D.C. Circuit found a common underlying thread in the Supreme Court's First Amendment decisions. The thread was that "whenever the

Government denies freedom of expression on property generally open to the public, the restriction must be justified by a significant governmental interest-whether that interest derives from the very nature of the property itself, or from some other source." *Grace I*, 655 F.2d at 1202. In this case, there is no significant governmental interest which would justify a ban on harangues and orations at all times, throughout the entire premises, and in any manner.

The Harangue Clause also places unfettered discretion in the police. If the statute were enforced as written, attorneys and litigants addressing the media after oral arguments would be arrested.[4] Yet, without any basis in the text of the statute, the Supreme Court and its police force have created an exemption for certain orations by a certain class of individuals. That the Harangue Clause is not enforced evenly is the result of its sweeping overbreadth. It "criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement. The . . . plain language is . . . violated scores of times daily, . . . yet only some individuals – those chosen by the police in their unguided discretion – are arrested. Far from providing the breathing space that First Amendment freedoms need to survive, the [Harangue Clause] is susceptible of regular application to protected expression." *See Houston v. Hill*, 482 U.S. 451, 466-67 (1987). As the Supreme Court has repeatedly warned, such dragnet laws are impermissible: "[I]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step

---

[4] According to Supreme Court Police Deputy Chief Timothy Dolan, "the Court allows litigants and parties in cases that have been argued to address the media on the plaza immediately following argument." (Dolan Decl. ¶ 9.)

inside and say who could be rightfully detained, and who should be set at large." *United States v. Reese*, 92 U.S. 214, 221 (1876).

## II.     The Uttering Clause is Unconstitutional

### A.  Utterances that are merely "loud" may not be prohibited

The government may regulate speech through reasonable time, place, and manner restrictions. To the extent that the Uttering Clause prohibits the use of any "loud . . . language" in the Supreme Court Building or grounds, it is neither a time or place restriction, as it applies at all times and throughout the entire forum. Even as a manner restriction, the prohibition on "loud" language is so broad as to amount to a total prohibition on all loud public speech. Such a sweeping ban is unconstitutional. *See In re Brown*, 510 P.2d 1017, 1022 (Cal. 1973) ("We conclude that section 415 cannot, consistent with First Amendment rights, be applied to prohibit all loud speech which disturbs others even if it was intended to do so.")

It is true that a variety of sound-related regulations have been upheld against constitutional challenges. The Supreme Court has held that reasonable limitations on the volume of music are constitutional. *Ward v. Rock Against Racism*, 491 U.S. 781, 784, 790 (1989). The Supreme Court has also upheld a ban on amplified speech. *Kovacs v. Cooper*, 336 U.S. 77, 87-89 (1949). Speech that is both loud and raucous can be prohibited. *Id.* A prohibition on loud shouting and cheering, when intended to disrupt rather than persuade, may also be constitutionally restricted where the purported communication is used as a guise to disrupt lawful endeavors. *See Giboney v. Empire Storage Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgement of

freedom of speech or press to make a course of conduct illegal merely because the

conduct was in part initiated, evidenced, or carried out by means of language, either

spoken, written, or printed.") Loud speech may also be prohibited where it creates a clear

and present danger. *Schenck v. United States*, 249 U.S. 47, 52 (1919) (government may

prohibit falsely shouting fire in a crowded theatre and causing panic). What the

government may not do is ban unamplified speech that is neither disruptive nor likely to

cause a breach of the peace. In other words, the government may not ban speech solely

because it is loud, without regard to whether the speech was made at an appropriate time

and place.

In *Saia v. New York*, 334 U.S. 558 (1948), the Supreme Court first examined the

relationship between the First Amendment and sound volume. The appellant is *Saia*, a

minister of Jehovah's Witnesses, was arrested and convicted for using a sound

amplification device without a permit. Complaining witnesses testified that they were

annoyed by the sound, but not by the content, of his speeches. The Supreme Court struck

down the law, which it observed was not "narrowly drawn to regulate the hours or places

of use of loud-speakers, or the volume of sound (the decibels) to which they must be

adjusted." *Id.* at 560. Significantly, the Court noted that loudspeakers "are today

indispensable instruments of effective public speech," and concluded that abuses created

by sound amplification devices would have to be controlled by narrowly drawn statutes:

> "The present ordinance would be a dangerous weapon if it
> were allowed to get a hold on our public life. Noise can be
> regulated by regulating decibels. The hours and place of
> public discussion can be controlled. But to allow the police
> to bar the use of loud-speakers because their use can be
> abused is like barring radio receivers because they too make
> a noise. The police need not be given the power to deny a

man the use of his radio in order to protect a neighbor against sleepless nights. The same is true here.

"Any abuses which loud-speakers create can be controlled by narrowly drawn statutes. When a city allows an official to ban them in his uncontrolled discretion, it sanctions a device for suppression of free communication of ideas. In this case a permit is denied because some persons were said to have found the sound annoying. In the next one a permit may be denied because some people find the ideas annoying. Annoyance at ideas can be cloaked in annoyance at sound. The power of censorship inherent in this type of ordinance reveals its vice." *Id.* at 562.

Later, in *Kovacs*, 336 U.S. at 81-82, the plurality remarked that an "[a]bsolute prohibition within  municipal limits of all sound amplification, even though reasonably regulated in place, time and volume, is undesirable and probably unconstitutional as an unreasonable interference with normal activities." In upholding the constitutionality of the sound truck regulation at issue in *Kovacs*, the plurality emphasized that the regulation imposed "no restriction upon the communication of ideas or discussion of issues by the *human voice*, by newspapers, by pamphlets, by dodgers. We think that the need for reasonable protection in the homes or business houses from the distracting noises of vehicles equipped with such sound amplifying devices justifies the ordinance." *Id.* at 89. Concurring, Justice Frankfurter drew a distinction between "natural speech, *even of the loudest spellbinders*, and the noise of sound trucks," the latter of which is not accorded the same constitutional rights as the "unaided human voice." *Id.* at 96.

In *Edwards v. South Carolina*, 372 U.S. 229, 230-33 (1963), the Supreme Court reversed the breach of the peace convictions of a group of demonstrators. During a protest at the South Carolina State House grounds, the demonstrators marched and carried placards, and one of the leaders delivered a "religious harangue" while the

demonstrators loudly sang and stamped their feet and clapped their hands. According to a witness, the demonstrators engaged in conduct described as "boisterous," "loud," and "flamboyant." *Id.* at 233. In reversing the convictions, the Supreme Court distinguished the situation before it from a conviction under a narrowly drawn regulatory statute: "We do not review in this case criminal convictions resulting from the evenhanded application of a precise and narrowly drawn regulatory statute evincing a legislative judgement that certain specific conduct be limited or proscribed. If, for example, the petitioners had been convicted upon evidence that they had violated a law regulating traffic, or had disobeyed a law reasonably limiting the periods during which the State House grounds were open to the public, this would be a different case." *Id.* at 236.

The Uttering Clause is anything but precise and narrowly drawn. In contrast, the Supreme Court's prohibition on "noise disturbances," contained in Regulation Five, is a reasonable time, place, and manner restriction. Regulation Five provides, "No person shall, on the Supreme Court grounds, create any noise disturbance. For purposes of this Regulation, a noise disturbance is any sound that (1) falls within the definition of 'noise disturbance' set forth in 20 D.C.M.R. 20–27–2799; or (2) disturbs or tends to disturb the order and decorum of the Supreme Court or any activities authorized by the Court in the Supreme Court Building or on the Supreme Court grounds." The referenced provision of the D.C. Municipal Regulations, in turn, provides a detailed and objectively measurable definition of a "noise disturbance." [5]

---

[5] "Noise disturbance- any sound which is loud and raucous or loud and unseemly and unreasonably disturbs the peace and quiet of a reasonable person of ordinary sensibilities in the vicinity thereof, unless the making and continuing of the noise is necessary for the protection or preservation of the health, safety, life, or limb of some person. In making a determination of a noise disturbance, the Mayor shall consider the location, the time of

Regulation Five is a reasonable time, place, and manner restriction because there is a reasonable link between the prohibited conduct (making a noise disturbance) and the governmental interest the regulations seeks to protect (avoiding disruptions of official proceedings). Unlike Regulation Five, which reasonable targets conduct (making a noise disturbance), the Uttering Clause unreasonably targets speech (uttering "loud . . . language"). Laws targeting speech, as opposed to expressive conduct, are suspect. *Tex. v. Johnson*, 491 U.S. 397, 406 (1989) ("The Government generally has a freer hand in restricting expressive conduct than it has in restricting the . . . spoken word"). Particularly in the area of sound-related regulations, prohibitions on speech present the real potential for censorship because "[a]nnoyance at ideas can be cloaked in annoyance at sound." *Saia*, 334 U.S. at 562.

Even as to a nonpublic forum, a restriction on speech must still be reasonable. A ban on "loud . . . language," which is entirely untethered to the need to maintain the order and decorum of the court, is unreasonable. It is not reasonable to prohibit loud language regardless of whether the loudness is necessary; regardless of whether the speech is

---

day when the noise is occurring or will occur, the duration of the noise. In addition, the Mayor may consider the magnitude of the noise relative to the maximum sound levels permitted under this act, the possible obstruction or interference with vehicular or pedestrian traffic, the number of people that are or would be affected, and such other factors as are reasonably related to the impact of the noise on the health, safety, welfare, peace, and quiet of the community. A noise shall not be considered a noise disturbance if it is made during noncommercial public speaking during the daytime and does not exceed 80 decibels inside the nearest occupied residence in districts zoned R-1A, R-1B, R-2, R-3, or R-4. Except as it may otherwise conflict with provisions of this act, all measurements of noise levels shall be performed and verified by qualified inspectors of the Department of Consumer and Regulatory Affairs in accordance with the requirements specified in Chapter 29 of Title 20 of the District of Columbia Municipal Regulations. If the noise is made at night or does not involve noncommercial public speaking, the Mayor shall not be required to measure the decibel level of the noise to find a noise disturbance."

disruptive; regardless of whether the speech is raucous;[6] regardless of whether the

volume of the speech is intended to communicate a message rather to interfere with

official proceedings;[7] regardless of the time of day; regardless of whether the loudness of

the speech presents a clear and present danger of imminent violence; regardless of

whether the speech is amplified; regardless of the location of the speaker within the

forum; and regardless of the actual volume of the speech. The statute fails to account for

the fact that "[d]ifferent considerations . . . apply in different circumstances. For example,

restrictions appropriate to a single-building high school during class hours would be

inappropriate in many open areas on a college campus, just as an assembly that is

permitted outside a dormitory would be inappropriate in the middle of a mathematics

class." *See Grayned v. City of Rockford*, 408 U.S. 104, 120 n.45 (1972).

The statute targets speech activity and only speech activity in an impermissibly crude

approach, despite the need for precision in regulations that are restrictive of speech. The

statute is written in such a way that only those individuals desiring to exercise their First

Amendment right need fear prosecution under the statute. Those engaged in other

activities producing a high volume of sound, such as blowing an air horn in the middle of

oral arguments, are exempt from prosecution under this criminal statute. Unlike speech-

---

[6] *Normal v. Stelzel*, 441 N.E.2d 170, 173 (Ct. App. Ill. 1982) ("Noise which is both 'loud and raucous' is more annoying and obnoxious than that which is merely loud. Moreover, prohibitions concerning noise which is merely loud create additional problems with protecting free speech.")

[7] *Diehl v. Maryland*, 451 A.2d 115, 118 (1982) ("For if the words that caused the arrest were uttered or shouted in order to convey a message, then some accepted reason must be found for excluding them from First Amendment safeguards; if however, the verbal conduct was noncommunicative but, nevertheless could be reasonably expected to cause a potentially violent disruption, then there was no speech interest involved and the conduct may be constitutionally controlled.")

restrictive statutes which the Supreme Court has upheld, most noisy activities that disrupt or which are incompatible with the government's functioning are not within the statute's reach, but uttering a single loud word on the large plaza, while court is not in session, is prohibited. *Cf. Grayned*, 408 U.S. at 120 ("Noisy demonstrations that disrupt or are incompatible with normal school activities are obviously within the ordinance's reach. Such expressive conduct may be constitutionally protected at other places or other times, but next to a school, while classes are in session, it may be prohibited") (citations omitted). The prohibition on loud speech contained in the Uttering Clause therefore bears little relationship to the governmental interest in preserving the order of the Court and is an unreasonable restriction in violation of the First Amendment.

The Uttering Clause is also vague. If a teacher considers speaking to her class while they are assembled on the courthouse plaza and realizes that to be heard over the traffic noise she will have to use more than a conversational level, how would she determine if her unaided voice will be deemed "loud"? The same is true of one speaking to a colleague in the court's cafeteria while construction work is occurring nearby. The statute, by its terms, is not even limited to "unreasonably" or "unnecessarily" loud utterances. Thus, it provides visitors to the Court with no criteria at all by which to determine whether their speech will be criminal.

The "loud . . . language" prohibition of the Uttering Clause also vests too much discretion in the police. The prohibition on the use of loud language "criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement. The . . . plain language is . . . violated scores of times daily, . . . yet only some individuals – those chosen by the police in their

unguided discretion – are arrested. Far from providing the breathing space that First Amendment freedoms need to survive, the [Uttering Clause] is susceptible of regular application to protected expression." *See Houston v. Hill*, 482 U.S. 451, 466-67 (1987). If the statute were enforced in a nondiscriminatory manner, it would lead to the arrest of litigants arguing before the Court, justices having a heated discussion at a conference, a tourist on the Court's plaza who briefly cries out after accidentally dropping a heavy object on his foot, and individuals speaking on the sidewalk just loudly enough to be heard over the traffic. As the Supreme Court has wisely noted, "a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive." *Id.* at 472.

### B.  The prohibition on "abusive" utterances is unconstitutional

In *Gooding v. Wilson*, 405 U.S. 518, 520 (1972), the Supreme Court struck down a Georgia statute which provided, "Any person who shall, without provocation, use to or of another, and in his presence . . . opprobrious words or abusive language, tending to cause a breach of the peace . . . shall be guilty of a misdemeanor" (ellipsis in original). The Court held that because the statute "punishes only spoken words," it could "withstand appellee's attack upon its facial constitutionality only if, as authoritatively construed by the Georgia courts, it is not susceptible of application to speech, although vulgar or offensive, that is protected by the First and Fourteenth Amendments." *Id.* While the government has the power to punish speech and language that falls within "narrowly limited classes of speech," a "statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to

protected expression." *Id.* at 521-22. Because the dictionary definition of "abusive" extends beyond language that could be considered "fighting words," and Georgia's courts had not supplied a narrowing construction, the prohibition on abusive language was unconstitutional. *Id.* at 525.

Like the statute at issue in *Gooding*, the prohibition on "abusive" language contained in the Uttering Clause punishes only spoken words. Thus, the ban on "abusive" language in the Uttering Clause can only withstand a facial attack if it is not susceptible to protected speech. While a colorable argument was made by the appellant in *Gooding* that the language of the statute was limited to "fighting words" because the text of the statute required a showing of a tendency towards breach of the peace, the same cannot be said here. Unlike the statute at issue in *Gooding*, there is no limitation here that the utterance of abusive language tend to cause a breach of the peace. The present case involves a ban on "abusive" language that is therefore even broader than that which was found unconstitutional in *Gooding*. Accordingly, the ban on uttering abusive language is unconstitutional.

### C.   The Court need not determine if the prohibition on "threatening" utterances is constitutional at this time

Based on the information provided so far in discovery, it does not appear that the government intends to argue at trial that Defendants' alleged utterances were "threatening." Therefore, Defendants do not challenge this portion of the Uttering Clause.

**Conclusion**

Though many people disagree about whether large campaign contributions should be part of our democracy, none would dispute that the freedom to give an impassioned oration on a matter of social or political importance is an essential part of self-government. At times, such orations may be loud due to the depth of the speaker's convictions. Nevertheless, even loud orations and harangues are at the heart of those freedoms guaranteed by the First Amendment. While the Supreme Court is sometimes the guarantor of the freedom of speech, forcing citizens to leave their essential First Amendment rights behind when they enter the Supreme Court's premises would be ironic indeed.

/s/ Jeffrey Light

Jeffrey L. Light
LAW OFFICE OF JEFFREY LIGHT
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey@LawOfficeOfJeffreyLight.com
*Attorney for Defendants*