**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **UNITED STATES** |
| v. |
| **DAVID BRONSTEIN, <u>et al.</u>,** |
| Defendants. |

Case No. 15-cr-00048 (CRC)

<u>**MEMORANDUM OPINION**</u>

As James Madison observed long ago, "no language is so copious as to supply words and phrases for every complex idea, or so correct as not to include many equivocally denoting different ideas." <u>The Federalist</u> No. 47, at 225 (James Madison) (C. Rossiter ed., 1963). Legislatures at all levels have powerfully confirmed Madison's insight. Yet even if some imprecision must be tolerated in the vast web of statutes that govern our daily lives, the criminal law must be sufficiently definite to provide fair notice to those it would punish on society's behalf and to cabin the discretion of its appointed peacekeepers and factfinders. The question before the Court is whether a law prohibiting three separate forms of speech in the Supreme Court of the United States fulfills these important constitutional requirements.

The defendants are five individuals who stood up and spoke out at the beginning of a Supreme Court argument session last Term. They were charged with uttering "loud" language and making a "harangue" or "oration" in the Supreme Court building, all in violation of 18 U.S.C. § 6134. Defendants have moved to dismiss that count of the criminal information filed against them, challenging each of the above terms as unconstitutionally vague in all of their applications. With respect to "harangue" and "oration," the Court agrees—a prosecution under this language would violate the Due Process Clause. The word "harangue" is not only anachronistic; its meanings are too imprecise and varied to clearly delineate the prohibited

conduct.  The word "oration," while more common in modern parlance, suffers from similar

definitional ambiguity.  Read in isolation, the statute's prohibition of "loud" utterances also

poses vagueness concerns.  But because the term "loud" can be fairly construed as banning only

those utterances that disturb or tend to disturb the normal operations of the U.S. Supreme Court,

the Court will permit Defendants' prosecution based on that limiting construction.

### I.        Background

#### A.        The April 1, 2015 Incident

Defendants David Bronstein, Matthew Kresling, Yasmina Mrabet, Belinda Rodriguez,

and Richard Saffle arrived at the Supreme Court on the morning of April 1, 2015 to attend an

oral-argument session.[1]  They passed through an initial security checkpoint, entered the Upper

Great Hall, cleared security again, and took their places inside the courtroom.  Supreme Court

police officers stood at designated posts throughout the courtroom.  After a buzzer indicated that

proceedings would begin in five minutes, Officer Dunford recited the following message to all

assembled:

> Welcome to the Supreme Court of the United States.  During today's oral
> arguments it is important that you remain seated and silent.  When the first case
> breaks, please remain silent.  If you are remaining for the second case, remain
> seated.  If you are leaving, silently exit the Courtroom. . . . Please alert one of
> the police officers if you observe anything suspicious, and in the event of an
> emergency, please remain calm and follow the directions of a police officer.
> Thank you.

Govt.'s Opp'n Defs.' Mot. Dismiss 3 ("Opp'n").  The buzzer sounded again at 10:00 a.m.  The

Supreme Court Marshal struck a gavel to inaugurate the day's proceedings, and three police

---

[1]  The following facts are drawn from the Government's Opposition to Defendants' Motion to
Dismiss.  The Court accepts them as true for purposes of the present motion.  See United States
v. Ballestas, 795 F.3d 138, 149 (D.C. Cir. 2015).

officers standing in front of the public seating area motioned upward to implore visitors to stand.

As the Justices took the bench, the Supreme Court Marshal intoned a familiar greeting:

> The Honorable, the Chief Justice, and the Associate Justices of the Supreme Court of the United States. Oyez! Oyez! Oyez! All persons having business before the Honorable, the Supreme Court of the United States, are admonished to draw near and give their attention, for the Court is now sitting. God save the United States and this Honorable Court.

Id. The Marshal then gaveled audience members to their seats, and the police officers motioned downward to indicate that visitors should sit for the remainder of the argument session. By 10:02 a.m., only one member of the audience—Defendant Belinda Rodriguez—remained standing.

Rodriguez extended her arm in the air and stated, "We rise to demand democracy. One person, one vote!" Id. A Supreme Court police officer detained Rodriguez and escorted her out of the courtroom. Moments later, Defendant Kresling arose and stated, "We rise to . . . . Money is not speech. One person, one vote!" Id. Another police officer detained Kresling and escorted him away. Next up was Defendant Mrabet, who raised one arm and stated, "Justices, is it not your duty to protect our right to self-government? The first . . . overturn Citizens United. One person, one vote!" Id. She, too, was restrained and taken from the courtroom. Defendant Saffle then initiated a fourth interruption by stating, "Justices, is it not your job to ensure free, fair elections?" Id. at 5. Saffle's outburst met the same response. At this point, Chief Justice Roberts spoke from the bench to warn audience members against further demonstrations: "Anyone else interested in talking will be admonished that it's within the authority of this Court to punish such disturbances by criminal contempt." Id. Immediately thereafter, Defendant Bronstein began singing, "We who believe in freedom shall not rest; we who believe in freedom shall not rest." Id. Bronstein was detained and escorted out of the courtroom.

In all, these verbal interruptions lasted "approximately two to four minutes."  Id.  Each defendant was arrested, and the arresting officers—with the aid of other Supreme Court employees—processed the defendants elsewhere in the building.  All five defendants were transported to the U.S. Capitol Police station later that day to conclude the arrest process.  Two days later, on April 3, 2015, the U.S. Attorney's office filed a two-count criminal information against all five defendants.  See Information, ECF No. 1.  Count One alleged that each of the five, "with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer in the discharge of their duties, did demonstrate in or near a building housing a court of the United States," in violation of 18 U.S.C. § 1507.  Count Two charged all five defendants with "[1] unlawfully mak[ing] a harangue or oration, or [2] utter[ing] loud, threatening, or abusive language in the Supreme Court Building or grounds," in violation of 18 U.S.C. § 6134.  For the sake of simplicity, the parties have christened § 6134's two relevant clauses the "Harangue Clause" and the "Uttering Clause."  The Court adopts this terminology.

> B.      Defendants' Motion to Dismiss

On May 14, 2015, Defendants moved to dismiss Count Two as resting on a facially unconstitutional statute.  They advanced two sets of arguments.  First, noting that they had been charged with violating the Harangue and Uttering Clauses in their entirety, Defendants contended that select portions of those clauses were unconstitutionally overbroad in violation of the First Amendment.  Because the phrase "Supreme Court . . . grounds" includes the surrounding sidewalks, which have been held to be a "public forum" for purposes of First Amendment doctrine—see United States v. Grace, 461 U.S. 171, 180 (1983)—Defendants claimed that the Harangue and Uttering Clauses restrict too much protected speech and are

therefore facially unconstitutional.  And second, Defendants argued that both clauses were

unconstitutionally vague on their face so as to violate the Fifth Amendment's Due Process

Clause.  Specifically, they claimed that a prohibition of "loud" language gives visitors "no

criteria . . . to determine whether their speech will be criminal" and "vests too much discretion in

the police."  Defs.' Mot. Dismiss ("Mot. Dismiss") 13.  The Harangue Clause, too, allegedly

"places unfettered discretion in the police" in criminalizing "harangue[s]" and "oration[s]" in the

Supreme Court building and grounds.  Id. at 6.

In its brief in opposition, the Government clarified that it did not intend to prove that

Defendants uttered "threatening" or "abusive" language, or that they violated § 6134 anywhere

in the Supreme Court "grounds" other than the building itself.  See Opp'n 14, 17.  But rather

than obviate Defendants' First Amendment challenge by superseding the Information with a

more narrowly tailored charging document, the Government responded in kind.  It argued that

Defendants lacked standing to challenge parts of § 6134 that they were not actually accused of

violating and that the Harangue and Uttering Clauses passed muster under conventional First

Amendment forum analysis.

At an oral hearing held on September 29, 2015, the Government agreed to file a

Superseding Information, which it did on October 1, 2015.  Count Two now contains no

reference to "abusive" or "threatening" language or the Supreme Court grounds as a whole—it

simply charges Defendants with "unlawfully mak[ing] a harangue or oration or utter[ing] loud

language in the Supreme Court Building."  Superseding Information 2, ECF No. 38.  Defendants

subsequently informed the Court that they no longer intended to challenge Count Two on First

Amendment grounds.  But they "do continue to urge the Court to [d]ismiss Count Two on

vagueness grounds" as requested in their motion to dismiss.  Status Rep. of Oct. 13, 2015, ECF

No. 39, at 1.  The Court must therefore decide whether the Due Process Clause permits a prosecution for making a "harangue" or an "oration," or uttering "loud" language, in the Supreme Court building.

## II.      Standard of Review

A criminal defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  Pretrial motions may challenge "a defect in the indictment or information," as long as "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  Fed. R. Crim. P. 12(b)(3)(B).  See, e.g., United States v. Kim, 808 F. Supp. 2d 44, 55–57 (D.D.C. 2011) (reviewing a criminal defendant's motion to dismiss an indictment on First Amendment grounds).

## III.     Analysis

### A.      Principles of Constitutional Vagueness Doctrine

Vagueness doctrine is an outgrowth of the Due Process Clause of the Fifth Amendment, not the First Amendment.  United States v. Williams, 553 U.S. 285, 304 (2008).  A criminal law is unconstitutionally vague if it is written so imprecisely "that it fails to give ordinary people fair notice of the conduct it prohibits," or is "so standardless that it invites arbitrary enforcement" by police, prosecutors, and juries.  Johnson v. United States, 135 S. Ct. 2551, 2556 (2015).  Such provisions are vague to the extent that they call for "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings."  Williams, 553 U.S. at 306; see also City of Chicago v. Morales, 527 U.S. 41, 62 (1999) (rejecting the idea of "inherently subjective" criminal provisions as inimical to due process).  Statutes whose interpretation must be filtered through "individual sensitivities" are especially vulnerable to vagueness challenges,

because their meanings are "varying and unascertainable" rather than "principled and objective." Big Mama Rag, Inc. v. United States, 631 F.2d 1030, 1037–38 (D.C. Cir. 1980).  These notice and fairness concerns are heightened in the First Amendment context, where "a more stringent vagueness test should apply."  Holder v. Humanitarian Law Project, 561 U.S. 1, 19 (2010) (quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982)).

Nonetheless, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989); see also Grayned v. City of Rockford, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language.").  All law enforcement "requires the exercise of some degree of police judgment."  Grayned, 408 U.S. at 114.  The reality that virtually all statutes will generate interpretive difficulties at the margins is addressed not by vagueness doctrine, but by the requirement of proof beyond a reasonable doubt. Williams, 553 U.S. at 306.  Even an "imprecise" criminal law will satisfy due process, then, as long as it is fundamentally "comprehensible" *ex ante*.  Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971).  But there must always be an "ascertainable standard for inclusion and exclusion."  Smith v. Goguen, 415 U.S. 566, 578 (1974).  A criminal prohibition must have *some* objective core.

Claimants may bring either as-applied or facial vagueness challenges.  The former type "do not challenge . . . statutory terms in all their applications," but instead allege invalidity only insofar as a law prohibits "engaging in certain specified activities."  Humanitarian Law Project, 561 U.S. at 14.  With as-applied challenges, courts "consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of

others.'" Id. at 20 (quoting Hoffman Estates, 455 U.S. at 495) (alteration in original); accord

Parker v. Levy, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may

not successfully challenge it for vagueness."). This rule "makes no exception for conduct in the

form of speech." Humanitarian Law Project, 561 U.S. at 20.

Concluding that certain activity "fall[s] comfortably within the scope of" an allegedly

vague statute, id. at 22, does not usurp the jury's role when courts can find *as a matter of law*

that the conduct is "plainly prohibited," id. at 23.  If a court determines as a matter of statutory

interpretation that a complainant's own conduct was criminal, it may not "analyz[e] other

hypothetical applications of the law"—that is, invoke the fair-notice rights of others—to strike

down a statute as vague in all of its applications.  Hoffman Estates, 455 U.S. at 495.  But such a

disposition is available only if "[a]pplying the statutory terms . . . does not require . . .

untethered, subjective judgments."  Humanitarian Law Project, 561 U.S. at 21; see also id.

(concluding that most of plaintiffs' proposed activities fit the "narrowing [statutory] definitions"

of the terms "training" and "expert advice or assistance").

When a complainant whose conduct was not "clearly" proscribed as a matter of law

raises a *facial* vagueness challenge, the court may properly consider "the vagueness of the law as

applied to the conduct of others."  Hoffman Estates, 455 U.S. at 495.  When a court does "hold a

statute to be vague [on its face]" because of its irreducible subjectivity, "it is vague in all its

applications," even if virtually everyone would agree that "some conduct . . . clearly falls within

the provision's grasp."  Johnson, 135 S. Ct. at 2561.  Accordingly, a legislature may not, for

example, prohibit people from behaving "'in a manner annoying to persons walking by'—even

though spitting in someone's face would surely be annoying."  Id. (citing Coates, 402 U.S. at

611).  And a merchant charging a thousand dollars for a pound of sugar can successfully

challenge a statute criminalizing "unjust or unreasonable rate[s]" as facially vague, even though virtually no one would characterize such a price as just or reasonable.  Id. (citing United States v. L. Cohen Grocery Co., 255 U.S. 81, 89 (1921)).  The fundamental subjectivity of these terms would preclude a court from holding that *any* conduct plainly falls within their reach.

Lastly, courts must consider whether a provision is fairly "amenable to a limiting construction" before striking it down as vague.  Skilling v. United States, 561 U.S. 358, 405 (2010); see also id. at 410 (paring potentially vague statutory language down to its "core applications"); Hoffman Estates, 455 U.S. at 494 n.5 ("In evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered.").  For instance, a "contextual evaluation" of the statutory structure and the setting in which the relevant behavior occurred may help "determine[] the scope of the regulation."  United States v. Thomas, 864 F.2d 188, 197 (D.C. Cir. 1988).  In some situations, the text of "a statute written specifically for [a certain] context" may be fairly limited to prohibit only those activities "impact[ing] . . . the normal activities" of the forum.  Grayned, 408 U.S. at 112; see also United States v. Agront, 773 F.3d 192, 197 (9th Cir. 2014) (reasoning that "the requisite quantum of noise is found by looking to the context in which the regulation applies").

B.      Defendants' Facial Vagueness Challenges

1.      "Loud"

Defendants first claim that the Uttering Clause's prohibition of "loud" language is unconstitutionally vague in all of its applications.  What of the schoolteacher, Defendants ask, who realizes that she will need to raise her voice outside the Supreme Court building in order to instruct her charges amidst the hubbub of First Street?  Or the patron of the Supreme Court cafeteria who wishes to be heard over the clangor of nearby construction?  Defendants argue that

the word "loud" furnishes visitors "no criteria at all by which to determine whether their speech will be criminal." Mot. Dismiss 13. Defendants further complain that the prohibition of "loud" language "vests too much discretion in the police." Id. Depending on the sensibilities of the nearest officer, that provision would allegedly permit the arrest of someone who "briefly crie[d] out after accidentally dropping a heavy object on his foot," or a passerby "speaking on the sidewalk just loudly enough to be heard over the traffic." Id. at 14. Because Count Two now charges Defendants with violating the Uttering Clause only in the Supreme Court building, most of these examples are geographically beside the point. But Defendants have adequately registered their more general line-drawing concern with the word "loud."

Whether a criminal statute comports with due process must "be examined in the light of the conduct with which a defendant is charged." United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 33 (1963). So the question is whether the Uttering Clause's prohibition of "loud" language gave Defendants insufficient notice of what the clause criminalized, or invited arbitrary and standardless law enforcement, in the context of interrupting an oral-argument session at the Supreme Court. Even with the clause's parameters thus confined, this is not a case in which the provision "by [its] terms . . . appl[ies] without question to certain activities," with marginal or doubtful cases possible to imagine. Goguen, 415 U.S. at 578. For a court cannot hold that an impermissibly subjective criminal statute clearly applies to *any* conduct. The statute does not define "loud," nor (so far as the Court is aware) does that adjective have any "settled legal meaning[]." Williams, 553 U.S. at 306; cf. Humanitarian Law Project, 561 U.S. at 21 ("Congress also took care to add narrowing definitions to the material-support statute over time. These definitions increased the clarity of the statute's terms."). Well-regarded dictionaries

define "loud" simply as "[s]trongly audible; making a powerful impression on the sense of hearing,"[2] and "marked by intensity or volume of sound."[3]

The Court discerns no objective criteria for determining that a noise's audibility is strong enough, that the sense of hearing has been subjected to a powerful enough impression, or that a sound generates sufficient intensity.  These uncontroversial definitions of "loud" boil down to an irreducibly subjective formulation: producing enough volume to cause some set of human beings to describe it as strongly audible, powerful, or intense.  The context at issue here—ongoing judicial proceedings in which Defendants had been warned to "remain silent," Opp'n 3—only deepens this indeterminacy.  One police officer might conclude that *any* verbal communication qualifies as "loud" in the relative solemnity of a Supreme Court session, whereas another might believe himself authorized to arrest visitors who shout at the top of their lungs, but not distinctly audible whisperers and chatterers.  It is true that "we can never expect mathematical certainty from our language."  Grayned, 408 U.S. at 111.  But we can expect that our criminal law not "condition[] . . . liability on confusing and ambiguous criteria."  Colautti v. Franklin, 439 U.S. 379, 394 (1979).

To be sure, § 6134's prohibition of "loud" language calls for a different sort of subjective judgment than has been condemned in most of the Supreme Court's prior vagueness cases.  Under these decisions, legislatures may not criminalize "annoying" behavior, Coates, 402 U.S. at 611, or prosecute as "vagrants" those deemed to be "[r]ogues and vagabonds," "persons who use juggling," "common night walkers," or "habitual loafers," Papachristou v. City of Jacksonville,

---

[2]  Oxford English Dictionary Online (Sept. 2015), http://www.oed.com/view/Entry/110467?isAdvanced=false&result=1&rskey=iMLDkO& (last visited Dec. 22, 2015).

[3]  Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/loud (last visited Dec. 22, 2015).

405 U.S. 156, 156–57 n.1 (1972).  Nor may they prohibit people from treating the U.S. flag

"contemptuously," Goguen, 415 U.S. at 568; require criminal suspects to provide "credible and

reliable" identification to police officers, Kolender v. Lawson, 461 U.S. 352, 353 (1983); forbid

the electronic transmission of "indecent" communications, Reno v. ACLU, 521 U.S. 844, 871

(1997); or define "loitering" as remaining in one place "with no apparent purpose," Morales, 527

U.S. at 61.  Such amorphous standards transfer policymaking to police and juries with no plainly

proscribed activity from which to analogize.  A prohibition of "loud" language at least requires

some baseline level of noise, even if the proscribed decibel range is not marked "with

consummate precision."  Thomas, 864 F.2d at 195.  But a statute forbidding "unjust or

unreasonable rate[s]" was struck down in L. Cohen, 255 U.S. at 89, even though some monetary

charge was undoubtedly necessary for criminal liability and the real difficulty lay in determining

exactly which rates were excessive.  A prohibition of merely "loud" language—like one on

charging "unjust or unreasonable rate[s]"—simply "has *no* core."  Goguen, 415 U.S. at 578.

        That is not the end of the matter, however.  As the Supreme Court has observed, "[i]t has

long been our practice, . . . before striking a federal statute as impermissibly vague, to consider

whether the prescription is amenable to a limiting construction."  Skilling, 561 U.S. at 405.  The

Ninth Circuit very recently reviewed—and declined to strike down as vague—a regulation quite

similar to the Uttering Clause.  See United States v. Agront, 773 F.3d 192 (9th Cir. 2014).  That

regulation prohibited "[d]isorderly conduct which creates loud, boisterous, and unusual noise" on

property under the control of the Department of Veterans Affairs.  38 C.F.R. § 1.218(b)(11).  The

regulation also defined "Disturbances" as, among other things, "[c]onduct on property which

creates loud or unusual noise."  Id. § 1.218(a)(5).  After concluding that both subsections were

designed "to maintain a calm environment at VA facilities," the Ninth Circuit held that the

regulation prohibited only such noise as "would tend to disturb the normal operation of a VA facility." Agront, 773 F.3d at 197. Even though the regulation did "not identify a specific decibel level," the court was satisfied that "the normal operation of VA facilities provides an adequate measure for determining what constitutes prohibited conduct." Id. at 198. The Ninth Circuit patterned its opinion on the Supreme Court's in Grayned v. City of Rockford. Grayned upheld an ordinance prohibiting "the making of any noise or diversion which disturbs or tends to disturb the peace and good order of [a] school session." 408 U.S. at 108. Although the "prohibited quantum of disturbance [wa]s not specified in the ordinance," the Supreme Court concluded that forbidden activities could be "easily measured by their impact on the normal activities of the school." Id. at 112.

   The Court adopts the same approach here. The Government may prosecute Defendants for having "utter[ed] loud . . . language in the Supreme Court Building," but only insofar as their utterances disturbed or tended to disturb the normal operations of the U.S. Supreme Court. Such a construction is "fairly possible," Boos v. Barry, 485 U.S. 312, 331 (1988), and accords with Congress's evident intent to preserve the order, decorum, and proper functioning of the nation's highest Court.[4]

———————————————

[4] It is worth noting that this construction of the Uttering Clause overlaps considerably—perhaps entirely—with Regulation Five of the Supreme Court's Building Regulations. 40 U.S.C. § 6102(a)(2) authorizes the Marshal of the Supreme Court, with the approval of the Chief Justice, to prescribe regulations "that are necessary for . . . the maintenance of suitable order and decorum within the Building and grounds." These regulations carry the same penalties as violations of the Harangue and Uttering Clauses. 40 U.S.C. § 6137. Regulation Five forbids the creation of "noise disturbance[s]" within the Supreme Court Building and grounds, defined (in part) as "any sound that . . . tends to disturb the order and decorum of the Supreme Court." Regulation Five, Supreme Court of the United States: Building Regulations, http://www .supremecourt.gov/publicinfo/buildingregulations.aspx (last visited Dec. 22, 2015). The existence of Regulation Five does not affect the Court's holding. The Court would have adopted its present construction of § 6134 had Regulation Five never been promulgated; it will not

2.    "Harangue" and "Oration"

No principled limiting device exists to alleviate the vagueness of § 6134's other contested

terms, "harangue" and "oration."  Section 6134 fails to define either term, and neither one

appears to have a "settled legal meaning[]."  Williams, 553 U.S. at 306.  The Government has

not cited any case law that might crystallize the words' ambiguous meanings in the context of a

legal venue like the Supreme Court.  From leading dictionaries' entries on "harangue" and

"oration," the Court discerns not an objective and neatly isolable core, but a multiplicity of

meanings—many inviting purely subjective reactions—that it cannot referee in any neutral

fashion.

Although § 6134 was passed in the mid-twentieth century,[5] the word "harangue" is

something of an anachronism.  It appears in no other federal statute or regulation, civil or

criminal.  The various definitions of "harangue" rest largely on subjective assessments of the

nature of the speech involved.  The Oxford English Dictionary defines "harangue" as "a speech

addressed to an assembly; a loud or vehement address, a tirade; formerly, sometimes, a formal or

pompous speech."[6]  According to Merriam-Webster, a "harangue" is "a forceful or angry

---

invalidate an act of Congress merely because the Marshal and Chief Justice have implemented a
broad grant of authority in a way that closely resembles the limiting construction this Court has
placed on § 6134, which was adopted by a separate set of legal actors.

[5]  1949, to be precise.  For a brief history of Congress's enactment of the set of statutes
regulating conduct in the Supreme Court building and grounds, see Hodge v. Talkin, 949 F.
Supp. 2d 152, 162–63 (D.D.C. 2013), overruled on other grounds by Hodge v. Talkin, 799 F.3d
1145 (D.C. Cir. 2015).

[6]  Oxford English Dictionary Online (Sept. 2015), http://www.oed.com/view/Entry/84094?rskey
=vY8eQx&result=1#eid (last visited Dec. 22, 2015).

speech," "a speech addressed to a public assembly," or "a ranting speech or writing."[7]  And

Ballentine's Law Dictionary defines "harangue" as "[a] noisy, bombastic, ranting speech."[8]

Citing other dictionaries would only compound the uncertainty by expanding the pool of possible

meanings.  The Government proposes that the Court exalt one element of one dictionary's multi-

part entry by deeming the word's "ordinary definition" to be "a forceful or angry speech."

Opp'n 29.  Even accepting this suggestion, whether certain utterances are "forceful" or "angry"

cannot be determined without reference to subjective perceptions and individual sensitivities.

The same is true of the alternative modifiers "vehement," "formal," "pompous," "ranting,"

"noisy," and "bombastic."

Case law on the meaning of "harangue," such as it is, hardly clarifies its subjective and

multiple dictionary definitions.  A state supreme court has reported that a trial judge verbally

reprimanded a defendant who "interrupted the proceedings with verbal protests"—much as

Defendants allegedly did here—for engaging in a "harangue."  Quintana v. Virginia, 295 S.E.2d

643, 651 (Va. 1982).  Yet widely varied usages of that word abound.  See, e.g., Edwards v. South

Carolina, 372 U.S. 229, 233 (1963) (citing a city manager's statement that a "religious harangue"

was one element in what he described as a course of "boisterous, loud, and flamboyant conduct")

(internal quotations omitted); Ognibene v. Parkes, 671 F.3d 174, 199 (2d Cir. 2011) (contrasting

"[p]assing criticisms" with "passionate harangues" by reference to "the intensity of a speaker's

expression"); White v. Dunlap, 175 F. Supp. 2d 1281, 1284 (D. Kansas 2001) (stating that

someone who allegedly "yell[ed] and scream[ed]" and "ranted for hours" would have engaged in

---

[7] Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/harangue (last visited Dec. 22, 2015).

[8] Ballentine's Law Dictionary 548 (3d ed. 1969).

a "harangue"); <u>Pennsylvania v. Brown</u>, 164 A. 726, 728 (Pa. 1933) (quoting a jury instruction as having defined "harangue" as "a noisy, bombastic, ranting speech," in accordance with <u>Webster's New International Dictionary</u>).

The word "harangue" simply has no "unambiguous scope," <u>Hoffman Estates</u>, 455 U.S. at 494 n.6—no heartland of "paramount applications" to furnish a secure limiting principle, <u>Skilling</u>, 561 U.S. at 404.  There is no indication that Congress "certainly intended the statute to cover" at least the most narrow definitional formulations of "harangue."  <u>Id.</u>  For all the Court can tell, an additional requirement of pomposity, vehemence, or bombast was meant to differentiate "harangue" from its clausal neighbor, "oration."  And especially given that "a more stringent vagueness test" applies to criminal statutes that interfere with First Amendment rights, <u>Humanitarian Law Project</u>, 561 U.S. at 19 (quoting <u>Hoffman Estates</u>, 455 U.S. at 499), the Court will not strain to salvage an amorphous criminal provision in the absence of any principled guidance.  The term "harangue" is therefore unconstitutionally vague on its face, and a prosecution for making one would violate the Due Process Clause.[9]

---

[9]  The definitional imprecision of "harangue" is exacerbated by the rarity of its use in modern American English.  Google's Ngram Viewer—which plots the "frequency of usage of selected words in the aggregate corpus of published books in different historical periods," <u>Authors Guild v. Google, Inc.</u>, 804 F.3d 202, 217 (2d Cir. 2015)—confirms that "harangue" is somewhat of a linguistic artifact.  According to this fascinating tool, the word's relative usage peaked in this country amid the fervent speechifying of the Revolutionary War, and has declined steadily ever since, with blips in the first and last decades of the nineteenth century.  Whereas "harangue" once vastly overshadowed its kindred nouns "tirade," "diatribe," "jeremiad," and "philippic," Ngram Viewer indicates that all five words now appear at a similarly infrequent rate, with "harangue" (including its verb form) running in second place as of 2008, slightly ahead of "diatribe."  (A visual representation of the Court's Ngram search is attached as Appendix A to this opinion).  While the Court does not rest its holding on the word's dwindling use, these findings lend some support to the conclusion that § 6134's ban on harangues does not put today's ordinary American on notice of how not to behave in and around the Supreme Court.

Section 6134's prohibition on making an "oration" suffers a similar fate.  While the term is certainly more familiar to the average citizen than "harangue," it appears (but is not defined) in only one other federal statute, where making an "oration" is deemed to be a form of "demonstration" forbidden on certain federal cemetery property.  See 38 U.S.C. § 2413.  An accompanying regulation similarly prohibits "[e]ngag[ing] in any orations" on Arlington National Cemetery grounds.  32 C.F.R. § 553.22(f)(3).  The Court has found just one other use of the word "oration" in a federal regulation—38 C.F.R. § 1.218(a)(14)(ii)'s prohibition of "any . . . demonstration" on VA property, defined (in part) as "any oration or similar conduct to assembled groups of people."  The context of these statutes hardly sharpens the term's meaning—these usages merely clarify that orations have been understood to qualify as one form of demonstration, and that orations can be made to assembled groups of people.

The Oxford English Dictionary defines "oration" as "[a] formal discourse delivered in elevated and dignified language, esp. one given on a ceremonial occasion such as a public celebration, a funeral, etc."[10]  Merriam-Webster's entry is quite similar: "a formal speech," or "an elaborate discourse delivered in a formal and dignified manner."[11]  As with "harangue," the Government asserts that a fragment of one of these entries is the word's "ordinary definition"— namely, "a formal speech."  The problem with this attempted narrowing is that understandings of formality are "varying and unascertainable," because they are inevitably "colored by one's attitude[s]," background, and life experiences.  Big Mama Rag, 631 F.2d at 1037–38.  What strikes one observer as gruff and unceremonious may seem to another perfectly decorous and

---

[10]  Oxford English Dictionary Online (Sept. 2015), http://www.oed.com/view/Entry/132195? isAdvanced=false&result=1&rskey=gojAyw& (last visited Dec. 22, 2015).

[11]  Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/oration (last visited Dec. 22, 2015).

mannerly.  There is simply "no value-free measurement" of what characteristics render a manner of speaking "formal," id. at 1038, even in the special setting of ongoing judicial proceedings. The same is true of at least the adjectives "elevated," "dignified," and "elaborate."

The Court's research has uncovered almost no case law elucidating the meaning of "oration."  One state supreme court has "supposed" that "'an oration' is 'a public address.'" Massachusetts v. Gilfedder, 73 N.E.2d 241, 242 (Mass. 1947).  And in determining whether a defendant had "recite[d] an oration," the City Magistrates' Court of New York resorted to consulting the works of Plutarch, Aristophanes, Shakespeare, Tennyson, and Milton in holding that reading one's poetry aloud did not constitute "recit[ing] an oration."  People v. Morris, 201 N.Y.S.2d 739, 740–43 (1960); see also id. at 740 ("The Court has looked to the statute and regulations, as well as the decided cases, and finds no sufficient definition of the term 'recite an oration' to control the instant fact situation.  Accordingly, the Court has delved into classical authorities for assistance in resolving this question.").

A college literature syllabus is not a penal code.  An outspoken "person of ordinary intelligence," Williams, 553 U.S. at 304, should not be forced to peruse Paradise Regained—or, for that matter, obscure and aging state-court decisions—to skirt the criminal law's sting.  Even if defining "oration" as "a public address" would avert a vagueness challenge (hardly a sure assumption), that choice would require discarding the Oxford English Dictionary and Merriam-Webster entries for "oration," both of which entail something more than vocalization in the presence of others—namely, a degree of formality or solemnity.  Glossing over a word's central distinguishing feature would be an act of judicial will, not of principled construction.  It is not as if the "vast majority" of existing authorities embody such a limitation.  Skilling, 561 U.S. at 407 (quoting United States v. Runnels, 833 F.2d 1183, 1187 (6th Cir. 1987)).

\*          \*          \*

The Government may proceed under the theory that Defendants uttered "loud" language that disturbed or tended to disturb the normal operations of the U.S. Supreme Court.  But the terms "harangue" and "oration" are unconstitutionally vague in all of their applications. Congress has not defined these words, nor has their meaning "evolved over the years from repeated adjudications."  U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO, 413 U.S. 548, 572 (1973).  Due process demands greater rigor in deploying the "awful machinery of the criminal law."  United States v. Kozminski, 487 U.S. 931, 950 (1988) (quoting United States v. Shackney, 333 F.2d 475, 487 (2d Cir. 1964)).  And the Court will not impose a false consensus on the linguistic community for the sake of constitutional avoidance.

**IV.     Conclusion**

For the forgoing reasons, the Court will grant in part and deny in part Defendants' motion to dismiss.  A separate order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   December 22, 2015

# Appendix A

